

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LYNETTE WILSON, Individually and as  )
Administratrix of the Estate of RAUL ADAN  )
BARRIERA, deceased,  )
               )
      Plaintiff,  )
               )    No. 07 C 1682
      v.  )
               )    The Honorable William J. Hibbler
The CITY OF CHICAGO, a Municipal  )
Corporation, Officers ANDREW HURMAN,  )
D. CUMMENS and SGT. D. JEROME,  )
               )
      Defendants.  )

## MEMORANDUM OPINION AND ORDER

      Plaintiff Wilson brings this suit on behalf of herself and her deceased son against the City of Chicago and a number of Chicago police officers. She sets forth Section 1983 claims for excessive force and failure to train, and state law claims for wrongful death and *respondeat superior*. Her claims arise from the events of February 28, 2007, when she called 911 after her son, who suffered from schizophrenia and had previously attempted suicide, barricaded himself in his room. The defendant officers responded to her call and eventually shot and killed her son. The City of Chicago now moves for summary judgment on Wilson's claim for municipal liability under § 1983, which is based on the City's failure to train its officers on how to handle encounters with people suffering from mental illness. For the reasons set forth below, the Court grants Defendant's motion.

## I. Factual Background

The following relevant facts are undisputed, unless otherwise specified. The Court only considers a fact to be disputed if the party asserting the dispute offers evidence supporting that assertion. *See* Fed. R. Civ. P. 56(c).

On February 28, 2007, Raul Barriera barricaded himself in his bedroom and refused to come out. (Def. Rule 56.1(a)(3) Statement (hereinafter "Def. St.") ¶ 2.) He had attempted suicide at age eighteen and had been diagnosed with schizophrenia, but had not been taking his medications regularly. (Def. St. ¶ 3.) After several attempts to persuade Raul to come out of the bedroom, plaintiff called 911 for assistance, fearing that Raul might hurt himself. (Def. St. ¶ 4.) During the call to 911, plaintiff indicated that her son was mentally ill, that he had barricaded himself in his bedroom, and that she feared for his safety. (Def. St. ¶ 4.) Fire department personnel arrived on the scene several minutes later and eventually called for police assistance. (Def. St. ¶ 7.) Soon thereafter, Defendant officers Hurman and Cummens arrived, followed by Sergeant Jerome. (Def. St. ¶ 8.) After several minutes of attempting to persuade Raul to come of his room, Hurman and Cummens pushed the bedroom door partially open. (Def. St. ¶ 9.) Raul was holding a knife. (Def. St. ¶ 10.) At some point, Sergeant Jerome fired a taser weapon into the bedroom, striking Raul. (Def. St. ¶ 11.) However, Raul was able to remove the taser wire. (Def. St. ¶ 11.) Jerome fired the taser again, but the result was the same. (Def. St. ¶ 11.) Moments later, Officer Hurman fired his gun at Raul and shot him fatally. (Def. St. ¶ 11.)

Sergeant Jerome entered the Chicago Police Academy on May 31, 1994 and successfully completed the Chicago Police Department (CPD) basic recruit training program on November 16, 1994. (Def. St. ¶ 19.) When he received his training, basic recruit training consisted of 735 hours of training, exceeding the 400 hours recommended by the Illinois Local Government Law

Enforcement Officers Training Board, which prescribed and regulated training standards for law enforcement officers in Illinois. (Def. St. ¶ 19.) Officers Hurman and Cummens entered the Chicago Police Academy on October 28, 2002, and successfully completed the CPD basic recruit training program on June 5, 2003. (Def. St. ¶ 18.) At the time, the program consisted of 1006 hours of training, more than double the 480 hours recommended by the Illinois Law Enforcement Training and Standards Board, which prescribes and regulates training standards for law enforcement officers in Illinois. (Def. St. ¶ 18.)

At all relevant times, the State of Illinois has required that law enforcement officers receive at least four hours of training on dealing with variant behavior. (Def. St. ¶¶ 31, 36-37.) At the time Jerome attended basic recruit training, the program included a two-hour course entitled "Dealing with Variant Behavior." (Def. St. ¶ 31.) The course is designed to give recruits an overview of different behaviors exhibited by persons afflicted with mental illness, a broad informational base upon which they can reflect when encountering variant behaviors, and information to help them recognize emotional crisis and assist in formulating courses of action in response. (Def. St. ¶ 30.) Jerome's training also included a 35-hour course entitled "Problems in Human Behavior," which addressed a variety of topics, including stress management, interpersonal communication, managing conflict, and handling emotionally disturbed people. (Def. St. ¶ 31; Pl. Resp. to Def. St. (hereinafter "Pl. Resp.") ¶ 31.) At the time Hurman and Cummens attended basic recruit training, "Dealing with Variant Behavior" was an eight-hour course. (Def. St. ¶ 37.) All three officers also completed the following courses as part of their recruit training: "Crisis Intervention/Disturbance Calls," "Civil Rights and Civil Liabilities," "Use of Force," "Deadly Force Policy," and "Hostage/Barricade/Terrorist Incidents." (Def. St. ¶ 21.)

In 2000, Lieutenant Jeffrey Murphy was assigned to the CPD's Research and Development division as commanding officer of the policy and procedure section. (Def. St. ¶ 32.) One of his duties was to work as a liaison between CPD and the Mental Health Services Council of Greater Chicago (MHSC). (Def. St. ¶ 33.) MHSC is a collaborative collection of stakeholders involved in the delivery of mental health services to the people of the Chicago area. (Def. St. ¶ 34.) That same year, the law enforcement sub-committee of MHSC recommended, among other things, that CPD establish a Crisis Intervention Team (CIT) program. (Def. St. ¶ 70.) However, MHSC recommended that other areas of concern be addressed beforehand. (Def. St. ¶ 70.)

In 2002, Lt. Murphy conducted a survey of police departments in the country to learn of their methods for responding to calls involving mentally ill persons. (Def. St. ¶ 72.) He learned that nineteen police departments had started using officers specially trained in crisis intervention techniques in programs resembling the CIT program first developed by the Memphis Police Department and known as the "Memphis Model." (Def. St. ¶ 72.) The core elements of such a program are: at least 40 hours of instruction to a percentage of officers who volunteer for the training, but are screened before selection; instruction through role-play exercises and scenario-based skills training emphasizing de-escalation techniques and diversion mechanisms; and collaboration with mental health care professionals, community-based health care delivery systems, diagnostic intake facilities, mental health advocacy groups, mentally ill persons, and families of mentally ill persons. (Def. St. ¶ 73.) In his survey and research report, Murphy recommended the establishment of a pilot program to introduce CIT training to two police districts that contained the two largest populations of persons receiving mental health services from the State of Illinois Office of Mental Health. (Def. St. ¶ 74.)

Within a month of submitting his report in 2004, Murphy met with CPD Superintendent Phil Cline, who authorized the pilot program. (Def. St. ¶ 80.) CPD officially launched the program July 1, 2005. (Def. St. ¶ 83.) Sometime in 2007, having reviewed two years of data on the pilot program, Lt. Murphy formally recommended that CPD extend the CIT program city-wide. (Def. St. ¶ 86.) In response, CPD ramped up CIT training and by the end of 2009, 1100 sworn CPD police officers and 184 other CPD personnel had received CIT training. (Def. St. ¶ 89.) As of August 13, 2009, at least one CIT-trained officer is available 24 hours a day, seven days a week, in each police district in Chicago.[1] (Def. St. ¶ 90.)

## II. Standard of review

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. *Id.* Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The non-moving party must produce specific facts showing there is a genuine issue of material fact, and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Finally, all evidence and inferences must be viewed in the light most favorable to the non-moving party. *Id.* at 255.

---

[1] While Plaintiff purports to contest this fact, it appears from her response that she only contests its significance. (Pl. Resp. ¶ 90.)

### III. Analysis

The instant motion only addresses Wilson's claim that the City should be held liable because its failure to properly train police officers on how to handle encounters with people with mental illnesses caused a deprivation of her son's constitutional rights. In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978), the Supreme Court held that a municipality may be sued under § 1983 for a constitutional deprivation caused by a municipal policy or custom. The Supreme Court has held that such a "*Monell* claim" can be based on a municipality's "failure to train" its employees under certain "limited circumstances." *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989). More specifically, a plaintiff can prevail on such a claim only if they can show that the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact," for only then "can such a shortcoming be properly thought of as a city 'policy or custom.'" *Id.* at 388-89, 109 S. Ct. at 1204-05. The focus of the Court's inquiry in such a case must be the "adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390, 109 S. Ct. at 1206. Thus, proof that a particular officer lacks adequate training will not suffice. *Id.* at 390-91, 109 S. Ct. at 1206. "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.*

In *Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997), the court applied the standards set forth in *City of Canton* to a set of facts that is somewhat analogous to those presented here. Village police officers responded to a complaint that a man was acting erratically and screaming threats in public. *Id.* at 1335. Upon arriving at the scene, the police found a man screaming

incoherently while brandishing a rusty muffler pipe and a fan blade. *Id.* The police received a report that he had shattered a neighbor's car windows. *Id.* When the police attempted to arrest him for the damage, the man acted violently, swinging the pipe and fan blade. *Id.* Eventually, the police shot and killed the man. *Id.* at 1336. The man's mother sued the sergeant that fired the shots and the village for failure to properly train the officer on how to handle persons behaving abnormally. *Id.* After a trial, a jury held the village liable under the deliberate indifference standard laid out in *City of Canton. Id.* at 1337. The village appealed the decision, requesting judgment in its favor on the *Monell* claim as a matter of law. *Id.*

Emphasizing the strict standards that apply to a "failure to train" claim, the *Palmquist* court ruled in the village's favor. *Id.* at 1347. The court found plaintiff's evidence regarding the village's failure to provide "special training" on handling abnormal behaviors unpersuasive because village officers did receive some training on abnormal behaviors as part of their basic training and there was no evidence suggesting that the basic training program was deficient. *Id.* at 1345. Similarly, Wilson has not pointed to any alleged deficiency in the City of Chicago's training regarding people with mental illnesses. Instead, she focuses on the CIT training that the officers could have received. However, the *Palmquist* court explicitly noted that evidence on what the village could have provided was insufficient. *Id.* at 1345-46. In fact, the City notes that here, just as in *Palmquist*, Wilson's expert did not even research the training the officers in this case did receive. *See id.* The City also provides a lengthy description of the coursework and training its officers received even prior to the implementation of the CIT program.

Wilson's case is arguably stronger than that of the plaintiff in *Palmquist* in only two respects. First, Wilson does cite to a considerable amount of evidence that there is a significant trend of providing CIT training in police departments in large cities. This contrasts slightly with

*Palmquist*, where the court found no evidence that training standards in the area had evolved since the defendant officer went through basic training. *Id.* at 1345. However, the fact that new training methods had been developed or become available does not mean that the old methods were automatically constitutionally deficient. Wilson still bears the burden of providing some evidence of this deficiency.

Secondly, Wilson does note that when Sergeant Jerome went through basic training, the "Dealing with Variant Behavior" course was only two hours long, even though the state required four hours of training on the subject. This is significant because the court in *Palmquist* did rely in part on the fact that the village's training complied with state requirements and there was no evidence that the state standards were deficient. *Id.* However, the City notes that Jerome also took a 35-hour course that satisfied the remainder of the requirement by including instruction on a number of relevant topics, including handling emotionally disturbed people.

Even taking these facts in the light most favorable to Wilson, and making all reasonable inferences in her favor, the Court cannot conclude that the training the City provided to its officers was deficient. Wilson simply provides too little to support such a conclusion in the face of the strict standards laid out in *City of Canton* and *Palmquist*. This is especially true given the City's apparent efforts to collaborate with the mental health services community to constantly improve and develop its training regarding encounters with people who suffer from mental illness. The fate of Wilson's son is undoubtedly tragic, but she has not provided sufficient evidence to find that it is the result of deliberate indifference by the City's policymakers to the constitutional rights of its citizens.

Neither is Wilson's case helped by the brief and factual statements her counsel submitted in support of her position. The documents are rife with incomplete sentences, improper or

inaccurate citations, inappropriate arguments, and inadmissible evidence that render certain portions virtually unreadable. The Court has nonetheless given Wilson the benefit of the doubt at all times, and taken all facts in the light most favorable to her, but the inadequacies warrant mention.

## *CONCLUSION*

For the above reasons, the Court GRANTS Defendant's motion for summary judgment on the claim for municipal liability on the basis of the City's policies or customs.


IT IS SO ORDERED.


_____3/15/11_____
Dated

Hon. William J. Hibbler
United States District Court